Steven C. LARSON, a minor, by Percy Larson, his father and natural guardian, Percy Larson, Individually, and Phyllis Larson, Respondents,

v.

INDEPENDENT SCHOOL DISTRICT NO. 314, BRAHAM, Minnesota, and James Lamont, Defendants,

Lyle Lundquist, Appellant (49854),

and

Jack Peterson, Appellant (49271).

Nos. 49271, 49854.

Supreme Court of Minnesota.

Nov. 9, 1979.

Rehearing Denied Jan. 28, 1980.

Lommen, Cole & Stageberg and John P. Lommen, Minneapolis, for Lundquist and School Dist. No. 314.

Gislason, Dosland, Malecki, Gilason & Halvorson, C. Allen Dosland, and Steven C. Isaacson, New Ulm, for Peterson.

Rider, Bennett, Egan & Arundel, David F. Fitzgerald, and Eric J. Magnuson, Minneapolis, Parker & Olsen and Robert S. Parker, Cambridge, for Larson.

Thomas E. Peterson, Minneapolis, for School Dist. No. 314.

Jardine, Logan & O'Brien and James J. Galman, St. Paul, for Lamont.

William B. Korstad, Roger Sahr, Minneapolis, G. William Smith, St. Paul, John D. Quinlivan, St. Cloud, Parker & Olsen, Cambridge, James J. Galman, St. Paul, Korstad, Lund, Soules, Erdall & McKendrick, Minneapolis, for Minnesota Assn. of Secondary School Principals.

PETERSON, Justice.

This action was brought on behalf of plaintiff Steven C. Larson, a minor, by plaintiff Percy Larson, individually and as natural guardian of Steven, against defendants Lyle H. Lundquist, Jack Peterson, and James Lamont, for injuries received by Steven on April 12, 1971, in an eighth grade physical education class at Braham Junior-Senior High School.[1] Trial was held in Isanti County District Court before Judge Thomas G. Forsberg, commencing on November 1, 1977. The trial court granted Lamont's motion for a directed verdict on November 28, 1977, on the ground that plaintiffs had not established a prima facie case of negligence against Lamont. On December 1, 1977, the jury returned a verdict finding Lundquist 90 percent negligent, Peterson 10 percent negligent, and Steven free from negligence.

The trial court awarded Steven, individually, judgment against Peterson and Lundquist, jointly and severally, in the sum of $1,013,639.75 together with his costs and disbursements and awarded Percy Larson $142,937.89 together with his costs and disbursements. The trial court further held that procurement of liability insurance in the sum of $50,000 by Independent School District No. 314 under Minn.St.1971, c. 466, waived the school district's absolute defense of governmental immunity for torts committed by its employees to the extent of $50,000 and that the school district was thereby jointly and severally liable with Peterson and Lundquist in the sum of $50,000 to each plaintiff.[2]

Post-trial motions for judgment notwithstanding the verdict or for a new trial, made on behalf of Lundquist and Peterson, were denied by order of the trial court on June 20, 1978. Lundquist and Peterson appeal from the order and from the judgment entered in favor of plaintiffs on July 12, 1978. Plaintiffs cross-appeal the order for a directed verdict in favor of Lamont. We affirm.

On April 12, 1971, Steven was severely injured while performing a gymnastic exercise known as a "headspring over a rolled mat," a required activity in his eighth grade physical education class. As a result of landing on his head, and from the force of running and diving onto the rolled mat, Steven broke his neck. The injury resulted in quadraplegic paralysis.

At the time of the accident, Steven was a student at Braham Junior-Senior High School. He was participating in a compulsory physical education class being taught by Lundquist, a first-year teacher with a teaching certificate in physical education. Lundquist had commenced teaching physical education classes at the school on March 10, 1971, when the former physical education teacher, Mark Embretson, was required

---

1. Defendants Jack Peterson and James Lamont moved for summary judgment, and the motions were granted on November 17, 1975, by Judge Carroll Larson of the Isanti County District Court. Judgment was entered on November 17, 1975, dismissing the actions against Peterson and Lamont. Plaintiffs Steven C. Larson and Percy Larson appealed to this court on November 24, 1975, and we held (*Larson v. Independent School Dist. No. 314*, 312 Minn. 583, 252 N.W.2d 128 [1977]) that summary judgment dismissing Peterson and Lamont be reversed and a new trial ordered, because Judge Larson did not have all of the pretrial depositions available to him at the time of his decision.

2. *In a footnote to their appellate brief, plaintiffs argue that the judgment of the trial court should be amended to hold the school district liable for the entire sum of the verdict. We disagree and hold that the trial court correctly applied the provisions of Minn.St.1971, c. 466.*

to report for military duty. The accident occurred nine class periods after Lundquist had replaced Embretson. Lamont was the superintendent of the school district, and Peterson was the principal of Braham Junior-Senior High School.

Plaintiffs' allegations of negligence against Lundquist were based upon arguments that Lundquist was teaching Steven's class the headspring before the class had participated in the necessary preliminary progressions of less advanced gymnastic exercises, progressions designed in part for safety, and that Lundquist was improperly spotting the exercise at the time Steven was injured.[3] The evidence at trial demonstrated that the headspring is an advanced gymnastic exercise[4] and, in the words of one of plaintiffs' expert witnesses, is "a high danger skill." Lundquist does not on this appeal specifically contest the sufficiency of the evidence as it relates to his negligence.[5] Furthermore, there is sufficient evidence in the record that Lundquist was negligent in teaching the headspring at the time and that Steven's accident occurred because Lundquist was negligent in spotting the headspring.

Plaintiffs' contentions of negligence against Superintendent Lamont and Principal Peterson were that they had not properly developed, administered, and supervised the physical education curriculum; that they had not properly handled the transition from Embretson to Lundquist; and that they had not properly supervised Lundquist's physical education instruction.

As principal, Peterson had a duty to exercise reasonable care in supervising the development, planning, and administration of the physical education curriculum within the school; in supervising and evaluating the work of teachers within the school; and in maintaining conditions conducive to the safety and welfare of students during the school day.[6] In effect, the jury found that Peterson's actions as an administrator were unreasonable and that his failure to reasonably administer the curriculum and supervise the teaching of an inexperienced instructor created the opportunity for Steven's accident to occur. A review of the record demonstrates that the jury could make such a finding.[7]

■ Other than to furnish Lundquist with a copy of Curriculum Bulletin No. 11,

3. Two mats are used in performing a headspring over a rolled mat—one mat lies flat upon the floor, and the other mat is rolled and placed upon it. The standard technique for spotting the headspring, as indicated by the evidence, is for the spotter to straddle and sit upon the rolled mat or to crouch over it, using the weight of his body and legs to anchor the mat and using his hands to assist and provide protection to the person performing the headspring. The evidence demonstrated that a spotter was not straddling the rolled mat at the time of Steven's accident. Lyle H. Lundquist was standing near the rolled mat, spotting on the approach, and two student spotters, as instructed by Lundquist, were standing on the landing portion of the flat mat.

4. The headspring consists of a number of basic skills, including a forward roll, a kip-up, a headstand with a forward roll, and a squat-to-stand with a run. Running to the mat makes the headspring a more complex maneuver, but is unnecessary. Lundquist included running to the mat in teaching the headspring to Steven's class.

5. Lundquist does contend that he was deprived of a fair trial by errors of the trial court in the reception of evidence. Our examination of the

record discloses that Lundquist's contention is without merit.

6. The duties prescribed for a principal by manuals of the department of education and the school district included: (1) Administering the rules and regulations of the board of education and the rules of the state pertaining to education; (2) making recommendations to the superintendent regarding courses of study and changes in the curriculum; (3) developing, organizing, administering, and implementing the curricular activity program; (4) observing the work of teachers in classrooms and serving as a consultant for improving and revising the curriculum; (5) providing for the orientation of new teachers on school policies and classroom procedures; (6) holding staff meetings; (7) organizing the program of studies and preparing individual class schedules; and (8) maintaining conditions that would ensure the safety and welfare of pupils during the school day.

7. This court will not disturb findings of fact by a jury unless they are manifestly and palpably contrary to the evidence as a whole. *Carpenter v. Mattison,* 300 Minn. 273, 219 N.W.2d 625 (1974); *Smith v. Hencir-Nichols, Inc.,* 276 Minn. 390, 150 N.W.2d 556 (1967).

"A Guide for Instruction in Physical Education, Secondary Schools, Grades 7–12, Boys and Girls," published by the department of education,[8] Peterson did not actively participate in developing or administering the physical education curriculum. Responsibility for those matters was entirely in the hands of Lundquist, a first-year teacher with little prior experience in physical education,[9] even though it was his first occasion to plan a unit of physical education as a physical education instructor. Plaintiffs introduced expert testimony which indicated a need for closely supervising the planning of a unit of gymnastics when a young teacher with little experience was involved. Furthermore, Peterson did not give Lundquist minimal guidance, such as telling him to abide by the provisions of Curriculum Bulletin No. 11 or explaining use of the bulletin's provisions.[10]

During the transition from Embretson to Lundquist, Peterson never met with the two teachers to discuss the physical education curriculum. When Peterson was informed of the exact date in March 1971 upon which Embretson would be leaving, he told Lundquist to meet with Embretson and plan physical education classes for the remainder of the year for the entire junior-senior high school. Peterson gave no instructions to either Embretson or Lundquist regarding the transition plan to be formulated. Embretson and Lundquist met for approximately 30 minutes to discuss the transition. Their discussion about gymnastics was limited to whether a unit in gymnastics had been taught and the possibility of Lundquist's teaching such a unit that year. When Lundquist reported to Peterson, he told Peterson what subjects he was going to teach, but he did not discuss in detail what activities he was going to include or what method he was going to use to teach gymnastics, partly because Peterson did not ask Lundquist detailed questions. No further meetings were held to discuss the transition.

Furthermore, testimony by one of plaintiffs' expert witnesses indicted that unit planning of physical education programs was important to ensure that proper progressions for the promotion of safety were followed and that such planning was to be in addition to daily lesson plans. Nevertheless, Embretson was not required to prepare a plan of activities for the entire school year, even though Peterson knew that Embretson might be leaving during the school year. Lundquist could not recall submitting, or Peterson's asking him to submit, a detailed written plan of what he was going to teach.

Because of Lundquist's inexperience, the jury could reasonably have believed that Peterson should have exercised closer supervision over planning and administering the physical education curriculum by specifically instructing Lundquist to refer to Curriculum Bulletin No. 11, by instructing an experienced physical education instructor like Embretson to closely plan the curriculum and submit a detailed report, or by requiring detailed written plans from Lundquist.[11] It could also have be-

8. As more fully discussed later in this opinion, we believe the activities and courses of study prescribed in Curriculum Bulletin No. 11 were intended to be used as guidelines and did not establish mandatory affirmative duties for teachers, principals, or superintendents. However, because evidence at trial indicated that the bulletin was used by many Minnesota school districts as a standard for planning and teaching physical education,. evidence of the manual's provisions was relevant for the jury's determination whether defendants breached the duty of care owed to Steven.

9. Lundquist's only previous experience in physical education instruction had been as a student teacher and as a substitute physical education teacher at the school for a limited number of times during the year of Steven's accident.

10. Testimony at trial indicated that introduction of the headspring by Lundquist to Steven's physical education class was not in accordance with the recommended scope and sequence of Curriculum Bulletin No. 11.

11. Peterson argues he was not an expert in physical education and therefore was entitled to rely upon Lundquist's expertise. Peterson's argument disregards Lundquist's lack of experience. Furthermore, if Peterson believed he lacked the expertise necessary to oversee a physical education curriculum, he could have delegated that function to someone else.

**118**

lieved that Peterson should have more closely supervised the transition between Embretson and Lundquist by formulating definite goals and requiring detailed reports. The jury's finding that Peterson was negligent is supported by the evidence.[12]

The trial court directed a verdict in favor of Superintendent Lamont on the ground that plaintiffs did not establish a prima facie case of negligence against him. On appeal, plaintiffs contend that the jury question of Lamont's negligence was sufficiently presented at trial. They argue that Lamont had a specific duty to develop and administer the physical education curriculum in compliance with Curriculum Bulletin No. 11 and that the breach of that duty resulted in Lundquist's failure to teach in accordance with the bulletin, which was the cause of Steven's accident. We affirm the trial court's directed verdict.

■ The crux of plaintiffs' position is that Curriculum Bulletin No. 11 established mandatory activities and courses of study which could not be departed from in a physical education curriculum. At the time of the accident, Minn.Reg.Edu 162(b) provided:

"(b) Secondary school course. There shall be taught in every secondary school the prescribed course of study prepared and published by the commissioner of education in accordance with M.S. 121.11, Subd. 7 and M.S. 126.02, which is Curriculum Bulletin No. 11, 'A Guide for Instruction in Physical Education, Secondary School, Grades 7–12, Boys and Girls,' * * * *"[13]

Plaintiffs contend this regulation demonstrates that Curriculum Bulletin No. 11 established mandatory affirmative duties for physical education instruction. We disagree.

The wording of Curriculum Bulletin No. 11 demonstrates that the bulletin was not intended to be viewed as a publication which established mandatory affirmative duties. For example, the preface to Curriculum Bulletin No. 11 provided:

"While it is hoped that this guide will present a framework for developing the very best in physical education in today's modern and highly complex world as well as for providing a unified experience on a state-wide basis, it is in no way intended to restrict the initiative, creativity, and ingenuity on the part of the respective schools and their teaching staffs. Rather, it is the hope of the curriculum committee that the very nature of this guide will stimulate effort to evaluate the proposed program and thereby to adapt, modify, and strengthen the program wherever need exists."

Similarly, a chart in the bulletin which classified the level of difficulty of the headspring was entitled, "Recommended Scope and Sequence by Grades and Types of Activities." The bulletin also contained a section entitled, "Suggested Schedule of Physical Education Activities," which stated: "Each school is encouraged to develop its own program of activities, using as a guide the planned schedule of activities." In addition, the word "guide" was used in the title of the bulletin.

It is clear that the activities and courses of study prescribed by Curriculum Bulletin No. 11 were essentially recommendations intended to be used as guidelines in developing a physical education curriculum. The bulletin did not establish mandatory affirmative duties. While plaintiffs spend a great deal of time explaining the provisions of the

**12.** Peterson also contends that it was error for the trial court to qualify one of plaintiffs' witnesses as an expert and to admit testimony by him concerning the duties owed by a principal to a student. Peterson claims the witness had neither education in nor work experience as a school principal or superintendent. Peterson did not include this objection in the grounds he cited as a basis for requesting an order granting a new trial on all issues. Objections to evidentiary rulings which are not assigned as error in a motion for a new trial are not reviewable by this court on appeal from judgment. *Fritz v. Arnold Manufacturing Co.*, 305 Minn. 190, 232 N.W.2d 782 (1975). We therefore refuse to consider this argument.

**13.** This regulation has since been changed and in its current form makes no reference to Curriculum Bulletin No. 11.

bulletin and illustrating why they believe Lundquist did not teach according to the bulletin's provisions,[14] their efforts do not specifically address the issue of Lamont's negligence. There was neither a regulation nor a rule which made Lamont personally responsible for ensuring that the provisions of Curriculum Bulletin No. 11 were followed in the school's physical education curriculum.

Lamont had general supervisory and administrative authority over the school system and was ultimately responsible to the school board for the manner in which the school system was managed; however, the evidence at trial established that he was not required to personally develop a physical education curriculum and that the examples of negligence which plaintiff alleged occurred in the administration and supervision of the curriculum and in Lundquist's teaching and transition were responsibilities expressly and properly[15] delegated to Principal Peterson. Except for matters of budgeting and financing, Peterson was the delegated administrator of Braham Junior-Senior High School. The school district's policy manual required Peterson to develop, organize, and implement the school's curriculum, including physical education classes. It further made Peterson responsible for assigning duties to teachers, supervising classroom instruction, providing orientation for new teachers, and administering the requirements of the board of education.

Superintendent Lamont was a level removed from these responsibilities. There is no showing in the record that Lamont had or should have had knowledge that Peterson had allowed an unsafe physical education curriculum to develop, that Peterson had improperly carried out the transition from Embretson to Lundquist, or that Peterson had failed to provide Lundquist

with adequate supervision. There is no showing that Lamont was inadequately supervising Peterson's performance, or that Lamont had special knowledge of problems in the physical education curriculum or of Lundquist's teaching methods which would have put him on notice that the safety of students was being threatened.

Lamont was not sufficiently involved in the actions or inactions upon which plaintiffs based their cause of action. There was, therefore, insufficient evidence that a negligent act by Lamont caused Steven's accident. The trial court's directed verdict in favor of Lamont was proper.

Lundquist and Peterson also argue that any liability on their part for Steven's accident is precluded by the common-law doctrine of discretionary immunity. Under the doctrine of discretionary immunity, state officials and employees are not absolutely immune from suit but ordinarily may be held liable only in the performance of ministerial rather than discretionary duties. As we observed in *Susla v. State,* 311 Minn. 166, 175, 247 N.W.2d 907, 912 (1976), "It is settled law in Minnesota that a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." We have described a ministerial duty as follows:

"* * * A ministerial duty is one in which nothing is left to discretion, a simple, definite duty arising under and because of stated conditions and imposed by law. The idea has been put in this language. 'Official duty is ministerial when it is absolute, certain and imperative, involving merely the execution of a specific duty arising from fixed and designated facts.'" (Citations omitted.) *Cook v.*

14. The physical education curriculum taught by Lundquist was improper, not necessarily because it deviated from Curriculum Bulletin No. 11, but because the weight of the evidence indicated that Steven's class had not been properly trained in the preliminaries necessary to safely perform the headspring, an advanced gymnastic exercise.

15. Minn.Reg.Edu 5(b)(2) sets forth the general duties and responsibilities of the superintendent of a school district and expressly notes: "Delegation of certain duties to subordinates is assumed."

Trovatten, 200 Minn. 221, 224, 274 N.W. 165, 167 (1937).

Classifying a person's acts as "discretionary" or "ministerial" is often difficult and, as recently noted in *Papenhausen v. Schoen*, 268 N.W.2d 565, 571 (Minn.1978), such a distinction has been subject to enigmatic application and occasional breakdown. However, important guidance on the question of immunity in the present case can be found in *Williamson v. Cain*, 310 Minn. 59, 245 N.W.2d 242 (1976), and *Hansen v. City of St. Paul*, 298 Minn. 205, 214 N.W.2d 346 (1974).

We held in *Williamson* that state employees who caused damage to a neighboring structure while attempting to demolish an abandoned building were personally liable to the neighboring property owner, because they were performing a ministerial duty. We there reasoned:

> " * * * While the discretionary-ministerial distinction is a nebulous and difficult one because almost any act involves some measure of freedom of choice as well as some measure of perfunctory execution, the acts of the defendants here are clearly ministerial. Their job was simple and definite—to remove a house. While they undoubtedly had to make certain decisions in doing that job, the nature, quality, and complexity of their decision-making process does not entitle them to immunity from suit." 310 Minn. 61, 245 N.W.2d 244.

We held in *Hansen* that failure of St. Paul city officials to control vicious dogs, when they had knowledge that the identified and impoundable dogs prowled uncontrolled upon public sidewalks, did not involve a discretionary function and that the city therefore was not protected by the "discretionary acts" exception to municipal tort liability provided under Minn.St. 466.-03, subd. 6. We noted that many jurisdictions, including Minnesota, found this kind of immunity to have greater applicability to decisions made on the executive or planning level of conduct than to decisions made on the operational level of conduct. 298 Minn. 211, 214 N.W.2d 350.

■ The two cases illustrate that applicability of the doctrine of discretionary immunity is not dependent upon whether a person's duty requires some degree of judgment and discretion. The crucial focus is upon the nature of the act undertaken. Decisions intended to be protected by discretionary immunity are those made upon the planning level of conduct.

■ Lundquist is not entitled to protection under the doctrine of discretionary immunity. The evidence established that he was negligent in spotting the headspring Steven was attempting to perform. While a person must use judgment in deciding how to spot a gymnastic exercise, the fact that he is using judgment does not establish that he is performing a discretionary duty. *Williamson v. Cain, supra.* Because of the special status school children have in the eyes of the law,[16] and because the headspring requires advanced gymnastic skills, the nature, quality, and complexity of the decisionmaking process used by Lundquist in deciding how to spot the headspring does not entitle him to immunity.

The manner in which Lundquist chose to spot the headspring did not involve a decision on the policy-making level. Once he decided to require Steven and others in his class to perform the headspring, it was Lundquist's responsibility to see that the headspring was safely taught and properly spotted. Lundquist's decision to spot the headspring in the manner he chose was a decision made on the operational level of conduct and clearly involved a ministerial duty.

Similarly, the improper teaching of the headspring essentially involved a ministerial function. In effect, the jury found that Steven's accident occurred, at least in part, because Lundquist attempted to teach Steven the headspring before he was able to

---

**16.** "School children have a special status in the eyes of the law, and in view of the compulsory attendance statute deserve more than ordinary protection." *Spanel v. Mounds View School Dist. No. 621,* 264 Minn. 279, 291, 118 N.W.2d 795, 802 (1962).

safely perform the advanced gymnastic exercise. While it may be a policy-level decision whether a teacher will be required to teach gymnastics or the headspring over a rolled mat, the actual teaching is a ministerial function because it involves decisions made at the operational level of conduct. The headspring was improperly taught because Steven was required to attempt it before he had had an opportunity to learn the preliminary skills which would have enabled him to safely perform the headspring. While Lundquist exercised judgment in deciding how to teach the headspring, the level of judgment he exercised was not intended to be covered under the doctrine of discretionary immunity.

■ It is difficult to apply the doctrine of discretionary immunity to Peterson, because a principal is required to make many decisions at the policy-making level while administering a school; however, under the facts of the present case, it is clear that Peterson was not exercising discretionary judgment protected by the doctrine. The gravamen of plaintiffs' negligence case against Peterson was the argument that because of Lundquist's inexperience, Peterson should have more closely supervised the planning and administering of the physical education curriculum. Peterson's negligence was, therefore, not rooted in any policy judgment he made about teaching or developing the physical education curriculum. Peterson never made decisions about teaching and developing the physical education curriculum, and his failure to do so was the primary evidence of his negligence.

The evidence indicates that Peterson never considered the merits of the physical education curriculum or the manner in which Lundquist was going to teach it. Peterson was briefly told by Lundquist what subjects Lundquist was going to teach but details were neither volunteered by Lundquist nor requested by Peterson. Peterson never required Lundquist or Embretson to have a detailed meeting with him to specify the matters decided upon between them. Detailed, written reports on the curriculum were not requested by Peterson from either Embretson or Lundquist. Peterson made no effort to see how Curriculum Bulletin No. 11 was being used or, indeed, if it was being used.

The doctrine of discretionary immunity is intended to protect a public official or employee whose policy-making duties include choosing between various alternatives, even if one of the alternatives is to do nothing. Cf., *Silver v. City of Minneapolis*, 284 Minn. 266, 170 N.W.2d 206 (1969). In the present case, Peterson did not engage in a discretionary choice between alternatives; he made no decision about the curriculum. In effect, Peterson completely abdicated his responsibility for developing, administering, and teaching the physical education curriculum. Because Peterson never engaged in decision-making relevant to developing and administering the physical education curriculum, his negligence did not involve decision-making on the planning level of conduct.

■ Discretionary immunity must be narrowly construed in light of the fact that it is an exception to the general rule of liability. Because of the special protection that the law affords school children, *Spanel v. Moundsview School Dist. No. 621*, 264 Minn. 279, 291, 118 N.W.2d 795, 802 (1962), failure by Peterson, in this case, to adequately supervise the planning and administering by Lundquist of the physical education curriculum cannot be considered decision-making that the doctrine of discretionary immunity is designed to protect. We therefore hold that Peterson's liability is not precluded by the doctrine of discretionary immunity.

Peterson also argues that his liability should be less than the amount determined by the trial court. He argues, and we reject, that (1) his liability is limited to the insurance coverage prescribed by Minn.St. 1971, § 466.04, and (2) that he is entitled to indemnity from the school district.

Minn.St.1971, § 466.04, provided, in part, as follows:

"Subdivision 1. Liability of any municipality on any claim within the scope of sections 466.01 to 466.15 shall not exceed

"a. $25,000 when the claim is one for death by wrongful act or omission and $50,000 to any claimant in any other case;

"b. $300,000 for any number of claims arising out of a single occurrence.

No award for damages on any such claim shall include punitive damages.

"Subd. 2. The limitation imposed by this section on individual claimants includes damages claimed for loss of services or loss of support arising out of the same tort."

The above provisions and other provisions of Minn.St.1971, c. 466, specifically dealt with municipal immunity and liability but did not specifically deal with liability and immunity of municipal officers or employees. Minn.St.1978, § 466.04, subd. 1a, which was added to c. 466 by the legislature in 1976,[17] now grants the following limitations upon liability of officers and employees: "The liability of an officer or an employee of any municipality for a tort arising out of an alleged act or omission occurring in the performance of duty shall not exceed the limits set forth in subdivision 1, unless the officer or employee provides professional services and also is employed in his profession for compensation by a person or persons other than the municipality."[18]

Peterson states that there is no relevant legislative history relating to the 1976 amendment but contends that a fair reading of c. 466 demonstrates that the amendment was intended to cure an oversight in drafting and expresses more clearly the legislature's prior intention that where municipality liability insurance existed, the negligent acts of an employee were to be compensated for but only to the extent of the insurance coverage. Peterson argues that a governmental body can only act through its officers or employees and that the legislature always intended in c. 466 that an officer or employee be subjected to personal liability only to the extent the governing body was liable either by the statute or a higher amount of liability coverage. Peterson's argument is not persuasive.

Adoption of an amendment by the legislature raises a presumption that it intended to make some change in existing law. *Western Union Telegraph Co. v. Spaeth*, 232 Minn. 128, 132, 44 N.W.2d 440, 442 (1950); *Fitzpatrick v. City of St. Paul*, 217 Minn. 59, 62, 13 N.W.2d 737, 738 (1944). Peterson did not produce sufficient evidence to rebut such a presumption. There was no specific mention of immunity or liability of a governing body's employees or officers in Minn.St.1971, c. 466.[19] Peterson

---

17. Laws 1976, c. 264, § 2.

18. Minn.St.1978, § 466.04, now provides: "Subdivision 1. Liability of any municipality on any claim within the scope of sections 466.01 to 466.15 shall not exceed

"(a) $100,000 when the claim is one for death by wrongful act or omission and $100,000 to any claimant in any other case;

"(b) $300,000 for any number of claims arising out of a single occurrence.

"No award for damages on any such claim shall include punitive damages.

"*Subd. 1a. The liability of an officer or an employee of any municipality for a tort arising out of an alleged act or omission occurring in the performance of duty shall not exceed the limits set forth in subdivision 1, unless the officer or employee provides professional services and also is employed in his profession for compensation by a person or persons other than the municipality.*

"*Subd. 1b. The total liability of the municipality on a claim against it and against its officers or employees arising out of a single* occurrence shall not exceed the limits set forth in subdivision 1.*

"Subd. 2. The limitation imposed by this section on individual claimants includes damages claimed for loss of services or loss of support arising out of the same tort.

"Subd. 3. Where the amount awarded to or settled upon multiple claimants exceeds $300,000, any party may apply to any district court to apportion to each claimant his proper share of the total amount limited by subdivision 1 of this section. The share apportioned each claimant shall be in the proportion that the ratio of the award of settlement made to him bears to the aggregate awards and settlements for all claims arising out of the occurrence." (Italics supplied indicates addition to prior statute.)

19. Additionally, it is arguable the legislature in Minn.St.1971, c. 466, recognized officers and employees could be exposed to liability for which a municipality would be immune when it provided authorization for a municipality to indemnify an officer or employee. § 466.07,

is, in effect, arguing that such language can nonetheless be inferred. We refuse to engage in such speculation.

Peterson also argues that he is entitled to indemnity from the school district because his actions were performed to fulfill his duties as principal and that any negligence on his part was passive in nature. He contends that where an agent is employed by another to do an act in the employer's behalf, it is the general rule that the law implies a promise of indemnity by the employer for damages that flow directly from the agent's acts.

 Peterson is not entitled to indemnity from the school district. His attempt to obtain indemnity is barred by governmental immunity conveyed to the school district under § 466.12, subd. 2. The limited waiver of immunity provided in § 466.12, subd. 3a, was the result of the legislature's desire that persons injured by the negligence of a school district's employee have recourse to the school district's insurance coverage. Peterson does not come within the class to whom waiver of the school district's governmental immunity has been granted. His quest for indemnity is therefore barred by c. 466. Furthermore, Peterson was found personally negligent, and he may not seek indemnity from his employer, whose only liability to plaintiffs in this case is vicarious.[20]

Affirmed.

TODD, J., took no part in the consideration or decision of this case.

WAHL, Justice (dissenting in part, concurring in part).

I agree with the majority that the directed verdict in favor of the superintendent was proper, that the evidence supports the findings of fact that Lundquist was negligent, and that Lundquist's liability was not precluded by the doctrine of discretionary immunity. However, because the record indicates to me that Peterson's alleged negligence arose out of acts requiring judgment and discretion, I would hold that Peterson is protected from liability by the doctrine of discretionary immunity.[1]

Except for budgetary and financial matters, Peterson was primarily responsible for the running of the school. This job required him to make policy decisions of many types, decisions which required him to use skilled judgment and discretion. Peterson's recommendations to the school district to hire Lundquist, a certified and apparently satisfactory physical education instructor, was a matter of judgment. No less so was his decision to let Lundquist and the former instructor, Embretson, plan the program and the lessons. Curriculum Bulletin No. 11, which Peterson provided to the physical education department, expressly indicated it was the teacher's job to work out the details in accordance with its guidance. That delegation was also a discretionary act.

In *Susla v. State*, 311 Minn. 166, 247 N.W.2d 907 (1976), this court held that the duties of the commissioner of corrections and the warden of the State prison in supervising the prison industries program called for the exercise of judgment and discretion, and therefore the commissioner and the warden were immune from personal liability to an inmate injured by a machine in the prison factory. Peterson's duties supervising Lundquist involved no less discretion than those of the defendants in *Susla*.

It is the majority view that Peterson's negligence was "not rooted in any policy judgment he made about teaching or developing the physical education curriculum," because Peterson had made no decision at

---

subd. 1. If a municipality's liability was coextensive with that of its officers or employees, there would be no need for indemnification.

**20.** Unlike defendants Lundquist and Peterson, the school district was not found to be negligent in Steven's accident. The school district is only liable to plaintiffs under Minn.St.1971, c. 466.

**1.** The trial court did not hold Peterson entitled to discretionary immunity only because it believed this court had foreclosed that option in its earlier decision.

all relevant to developing the curriculum. However, Peterson testified that he chose not to provide more specific direction to Lundquist or Embretson because the instructors were professionals with expertise in physical education, which he lacked.

This court in *Silver v. City of Minneapolis*, 284 Minn. 266, 170 N.W.2d 206 (1969), demonstrated that choosing to take no action can require as much an exercise of discretion as choosing one action over another. In *Silver*, citizens claimed that the city was negligent in failing to provide police and fire protection to their building after it had been requested. The court held that the proper deployment of police and fire protection in the face of impending riots, responding to certain requests but not to others, involved the exercise of the municipality's discretion.

Similarly, Peterson's decision not to request more detailed curriculum plans or to supervise Lundquist more closely was a discretionary decision made on the "planning level of conduct." Therefore, Peterson was immune from liability, and I would reverse on this issue.

Because I would hold Peterson immune from liability, I would not decide whether the jury's verdict of negligence against him should be upheld, whether his liability should be limited to the insurance coverage prescribed by Minn.St.1971, § 466.04, or whether he is entitled to indemnity from the school district.

OTIS, Justice (dissenting).

In order to assess the conduct of Jack Peterson, it must be kept in mind that he was principal of the entire school, not just of the physical education department. He was required to supervise the development, planning, and administration of the school curriculum, to supervise and evaluate all of the teachers, and generally to maintain conditions conducive to the safety and welfare of all of the students throughout the school day.

The record indicates that Peterson acted responsibly during the transition from Embretson to Lundquist. Both of those teach-ers were qualified and certified as competent to plan and teach a physical education curriculum. On the other hand, Peterson was not. He required Lundquist to meet with Embretson before Lundquist took over the class and had him report back regarding their discussions. Peterson's performance as a general school administrator is not challenged. He gave both Embretson and Lundquist the Board of Education physical education guide book. He left the details to the experts—the teachers, as an efficient administrator should.

Peterson required and received weekly lesson plans from all of his teachers, including Lundquist. Both before and after the accident, he periodically observed Lundquist's physical education classes.

It is unclear to me what more a principal can be expected to do, particularly when he is not trained or experienced in every course taught in school. If plaintiff had proved that Peterson had some expertise in physical education techniques and that he had notice that his teacher was not conducting tumbling exercises safely, it may well be a jury could find him negligent for not correcting the situation. Such is not the case, however.

Several courts which have considered this issue have refused to hold a school principal liable. In *Luce v. Board of Education of Johnson City*, 2 A.D.2d 502, 157 N.Y.S.2d 123 (1956) the principal was not liable for negligent supervision when an elementary child was injured during a physical education class. The court said:

"* * * Her duties, too, were administrative, supervisory, and general in nature. She was responsible for the assignment of class rooms, for discipline in the school, and administrative supervision over the teachers in the school. It does not appear that she had any authority, let alone duty, to personally supervise or to direct the nature of activities or limit the participation of any pupil in a physical education class. The physical education department was a separate arm of the Board of Education, operating in all of

the schools. Mrs. Denton, the physical education teacher in immediate charge here, was an agent of the physical education department. It is a matter of common knowledge that in modern times the educational and competency requirements of such a teacher are high. Of necessity the detailed activities of each class and of each student therein must be left to such supervising teacher. As observed in *Thompson v. Board of Education,* 280 N.Y. 92, 96, 19 N.E.2d 796, 797: 'Appellant [a principal] could not personally attend to each class at the same time, nor was any such duty imposed upon him.' * * * It does not appear that the principal had the power or authority to direct the detailed conduct of a physical education class, or to substitute her judgment for that of [the teacher]." Id. at 506, 157 N.Y.S.2d at 127.

The *Luce* case was followed and quoted with approval by the Oregon Supreme Court in *Vendrell v. School District No. 26C Malheur County,* 226 Or. 263, 360 P.2d 282 (1961). In that case a student was injured while playing football. The court held that the principal had no duty to supervise "the detailed activities involved in the conduct of the athletic program." Id. at 270, 360 P.2d at 286. Two recent Kentucky cases have also refused to hold the principal liable without a clearer showing of a breach of duty. *Wesley v. Page,* 514 S.W.2d 697 (Ky. 1974); *Cox v. Barnes,* 469 S.W.2d 61 (Ky. 1971).

The impact and effect of the majority's decision may shift much of the responsibility for the safety and welfare of the students from the personnel best suited to handle such problems to an administrator who is not an expert in every area of teaching and cannot be in all places at all times. It would compel principals out of an abundance of caution to impose restrictions and restraints on subordinate teachers which might very well be inappropriate and wholly inconsistent with sound teaching practices. Except in the rare case where the principal is negligent in selecting a teacher or fails to respond to actual notice of a potential hazard I would limit the liability of the principal and impose it where it belongs—on the negligent teacher and on the school board which is vicariously responsible under principles of respondeat superior.

## ORDER DENYING PETITION FOR REHEARING

Appellant, defendant principal Jack Peterson, petitioning for rehearing, expresses grave concern that the effect of our decision denying the defense of discretionary immunity is "to subject administrators of public schools to liability for almost any conceivable mishap that might happen in the vast number of areas of the school."

This concern is unfounded. Nothing in our opinion should be read to mean that school principals are never protected by the principle of discretionary immunity. The decision in this case is confined to its unique facts and on the narrow ground that, rather than exercising discretion, the appellant principal abdicated his responsibility by not acting at all. We have rejected the contention that he did not abdicate his responsibility and that "instead he delegated it to the experts as any good administrator should do."

The young physical education teacher, in whose gymnastics class the plaintiff pupil was injured, was new to the teaching profession, and he had never been called upon to prepare and implement a lesson plan as a full-time physical education instructor. The teacher was new, too, to plaintiff's class and had no knowledge of what the class had been taught in the past, important to a determination of whether this young pupil was prepared for the obviously hazardous exercise that resulted in paralyzing injury.

It should be noted that evidence from which the jury could find that defendant principal was negligent came from teaching professionals: a former principal, later a superintendent; a university professor of physical education curriculum; and a high school gymnastics coach and director of physical education. It was their testimony

that gymnastics is an activity which can be more dangerous than other units of physical education and therefore requires carefully planned instruction; that a new teacher requires more careful supervision in the planning of his curriculum than an experienced teacher; and that a school principal should ensure that there is consultation with the new teacher as to what the class had learned and what it would be learning in the future. A principal, as a responsible school administrator, must exercise reasonable care in the discharge of such specific administrative responsibilities. These functions may not, without more, be entirely delegated by the responsible supervisor to others.

This most regrettable case for both the principal and the pupil prompted careful consideration at the outset and now on the petition for rehearing. Except as the petition makes apparent a misconception as to the scope of our holding, however, it raises no points not fully considered in our main opinion.

The petition accordingly must be and is denied.