Virginia Rae PAPENHAUSEN, et al., Appellants,

v.

Kenneth SCHOEN, et al., Respondents,

William McRae, et al., Respondents,

Vera Likins, et al., Respondents,

Richard Mulcrone, et al., Respondents,

State of Minnesota, Respondent.

No. 48100.

Supreme Court of Minnesota.

June 23, 1978.

Douglas, Jaycox, Trawick & McManus, Bruce C. Douglas, Minneapolis, for appellants.

Gary Hansen, Sp. Asst. Atty. Gen., Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., Barbara D. Gill, Joseph B. Mar-

shall, Michael R. Saeger, Richard G. Evans, Sp. Asst. Attys. Gen., St. Paul, for respondents.

Heard before TODD, SCOTT, and GODFREY, JJ., and considered and decided by the court en banc.

TODD, Justice.

This is a tort action arising out of an aggravated assault and rape committed by an escapee from the Anoka State Hospital (the state hospital) on May 25, 1976. The plaintiffs include the rape victim and members of her family. The complaint alleges negligence in the transfer of the inmate from the St. Cloud Reformatory (the reformatory) to the minimum-security facility at the state hospital. The State of Minnesota and a number of state officials are named as defendants. On motions for summary judgment, the individual defendants raised the defense of discretionary or quasi-judicial immunity, and the state invoked the doctrine of sovereign immunity. The district court ruled in favor of all defendants. We affirm.

In January 1973, Charles A. Dion pleaded guilty to a charge of burglary in district court. It appears that in the course of the burglary he attempted to rape a woman he encountered on the subject premises. Dion was sentenced to a prison term not to exceed 20 years and was incarcerated at the reformatory. Pursuant to its normal procedure, the Minnesota Corrections Board (the parole board) made an annual review of Dion's file in 1974 and 1975, denying his request for parole on each occasion. Included in Dion's file was the report of a consulting psychiatrist at the reformatory recommending that Dion be transferred to the state hospital for treatment.

Early in 1976, the parole board determined that the possibility of paroling Dion to the state hospital warranted further examination. Dion was subsequently interviewed by Dr. Victor Romero (a staff psy-chiatrist and medical chief of the Vail unit at the state hospital) and two other staff members. Dr. Romero also reviewed the psychiatric reports in Dion's file. Because of the apparent disparity of professional opinion on the question of whether Dion was mentally ill, Dr. Romero refused to accept Dion at the state hospital on a permanent basis. Instead, he agreed to take Dion for a 1-month evaluation period at the state hospital.

In accordance with Dr. Romero's proposal, the parole board on May 6, 1976, granted Dion a 30-day "medical parole" to the state hospital. Dion arrived at the state hospital on May 14, 1976. The state hospital is known as an "open hospital," where patients are free to move about on the grounds as they please. No special effort was made to place Dion in more secure quarters because he exhibited no signs of psychosis or hazardous behavior. Also, no instructions were received from the reformatory specifying secure quarters for Dion, and only a relatively small space is available for such purposes at the state hospital.

Dion "escaped" from the state hospital on May 25, 1976, and assaulted and raped Virginia Rae Papenhausen. On August 6, 1976, Dion pleaded guilty to criminal sexual conduct in the first degree and aggravated assault.[1] Virginia, her husband, and her son (through his father as guardian) bring this tort action for damages. All three have alleged that they have suffered injury as a result of the negligent acts of state officials in allowing Dion to be transferred to a minimum security facility.[2]

Plaintiffs' complaint names the State of Minnesota and 15 state officials as defendants. The individual defendants include the commissioner and deputy commissioner of corrections; the superintendent and associate superintendent of the reformatory; the five members of the parole board; the commissioner, deputy commissioner, and an

---

1. Dion's criminal and civil liability is not before us.

2. Specifically, it is alleged that Dion was "un-lawfully, carelessly, unreasonably, negligently, or * * * intentionally" transferred from the reformatory to the state hospital.

assistant commissioner of public welfare; the administrator and assistant administrator of the state hospital; and Dr. Romero. At the trial court level, the individual defendants were divided into several groups, each of which was represented by a member of the attorney general's staff.

All individual defendants answered plaintiffs' complaint and moved for summary judgment. A hearing on the motions was held in February 1977. At plaintiffs' request, the hearing was continued until April 28, 1977, to give plaintiffs an opportunity to discover the information necessary to oppose the motions for summary judgment. In the interim between the hearings, the defendant State of Minnesota also moved for summary judgment. Following the April 28 consolidated hearing, the district court, on June 14, 1977, granted defendants' motions for summary judgment. Plaintiffs bring this appeal.

The issues before us are:

(1) Does the doctrine of sovereign immunity bar this tort action against the State of Minnesota?

(2) Was the district court correct in granting summary judgment for several of the individual defendants on the theory that they had no material connection with the alleged negligence?

(3) Were the remaining individual defendants entitled to summary judgment based on the doctrine of discretionary immunity?

1. The district court granted summary judgment in favor of the state on the theory that the state's sovereign immunity barred plaintiffs' tort action. While we abolished the sovereign immunity doctrine in *Nieting v. Blondell,* 306 Minn. 122, 235 N.W.2d 597 (1975), the events giving rise to this litigation occurred on May 25, 1976, before the *Nieting* decision became effective. As a result, this case must be decided under the law of sovereign immunity as it existed before *Nieting*. By now it is hornbook law that for the purpose of determining the state's tort liability, a distinction is drawn between "governmental"

and "proprietary" activities. Tort liability does not attach to the execution of governmental functions, while the negligent performance of proprietary activities subjects the government to liability coextensive with that of a private tortfeasor.

Prior to 1976, this court had on several occasions applied the governmental-proprietary distinction to political subdivisions within Minnesota but had never done so with respect to the state itself. In *Susla v. State,* Minn., 247 N.W.2d 907 (1976), however, we found it appropriate to adopt the same standard for determining the state's tort liability, stating:

"We can conceive of no justification for applying the governmental-proprietary distinction to the activities of local governmental units in tort cases but not to the activities of the state, especially when it has been applied to the activities of the state in contract cases. Thus, we hold that the sovereign immunity of the State of Minnesota from tort liability, as it existed up to the effective date of the *Nieting* decision and L.1976, c. 331, did not extend to suits on torts committed in its proprietary capacity." Minn., 247 N.W.2d 910.

Relying on the *Susla* decision, the state argues that it is liable in tort for the negligence, if any, of the hospital or prison officials in this case only if the operation of those institutions is proprietary in nature. In the state's view, the reformatory and the state hospital are strictly governmental institutions, the operation of which cannot subject the state to tort liability. In response, the plaintiffs make two arguments.

Plaintiffs first contend that the legislature impliedly abolished the doctrine of sovereign immunity on April 21, 1976, before the state's alleged negligence in this case occurred. This argument is based on the action taken by the legislature following this court's decision in *Nieting v. Blondell, supra.* At the time the *Nieting* decision was filed, Minn.St.1974, § 3.66 et seq. made provision for a state claims commission to hear and rule on certain claims made against the state. In response to *Nieting,*

the legislature during its 1976 session enacted a new tort claims act to take effect on the operative date of the *Nieting* decision— August 1, 1976.[3] As part of the same bill, the legislature repealed the provisions which had established and governed the state claims commission.[4] Unlike the new tort claims act, however, the repealer abolishing the claims commission took effect on the day following its enactment. As of April 21, 1976, therefore, the commission ceased to exist.

Plaintiffs urge that because the old statutory scheme was repealed before the new tort claims act took effect, a 3-month gap occurred in the statutory coverage. The alleged effect of this gap was to leave remediless persons, like plaintiffs, having tort claims arising during the 3-month period. As a consequence, it is argued, the repealer should be construed as an implied legislative acceleration of the elimination of sovereign immunity. If plaintiffs' reasoning is accepted, then the rule of sovereign immunity must be deemed abrogated as of April 21, 1976—more than a month before plaintiffs' claims arose.

Contrary to plaintiffs' assertion, however, the elimination of the state claims commission did not deprive them of a remedy other than a standard tort action. Indeed, it appears that at the time when the commission was formally abolished, it had been inactive for a number of years. During that time, the commission's function was performed by the Joint Senate-House Claims Subcommittee. This legislative committee hears claims and introduces special bills in the legislature for the purpose of compensating qualified claimants. We have reviewed each of the provisions which was repealed by L.1976, c. 331, § 42, and none of them in any way affects the operation of the claims subcommittee. In addition, a second avenue of compensation appears to be available to plaintiffs. The Minnesota Crime Victims Reparations Act, Minn.St. c. 299B, was enacted to provide compensation for the economic loss suffered by crime victims.

There is nothing in the record indicating that plaintiffs would not be eligible for reparations under the act, and plaintiffs' counsel admitted at oral argument that he had not yet pursued this remedy. In short, therefore, we must reject the contention that the repealer which took effect on April 21, 1976, left a gap in the legislative coverage of tort claims and constituted an implied abrogation of the state's traditional immunity from suit.

■ Plaintiffs' alternative argument is that even if the doctrine of sovereign immunity was in effect during May of 1976, it does not bar the negligence claims they seek to assert. It is urged that the operation of the state hospital is proprietary in nature, bringing this case within the familiar immunity exception for proprietary activities. The test which this court has employed for distinguishing between governmental and proprietary activities was stated in *Heitman v. City of Lake City*, 225 Minn. 117, 120, 30 N.W.2d 18, 21 (1947), and reaffirmed in *Reierson v. City of Minneapolis*, 264 Minn. 153, 156, 118 N.W.2d 223, 226 (1962):

> " * * * The principle of nonliability for governmental acts and liability for proprietary acts is easy to state but difficult to apply. When is the act governmental, and when is it proprietary? We have evolved no catchall test equally applicable to all situations. We have, however, come to recognize certain characteristics as indicative of the proprietary role. In *Storti v. Town of Fayal*, 194 Minn. 628, 632, 261 N.W. 463, 465 [1935], we adopted the rule of *Bolster v. City of Lawrence*, 225 Mass. 387, 390, 114 N.E. 722, 724, L.R.A.1917B, 1285, wherein the Massachusetts court said:

> " ' * * * The underlying test is whether the act is for the common good of all without the element of special corporate benefit *or* pecuniary profit. If it is, there is no liability; if it is not, there *may* be liability.' "

---

**3.** L.1976, c. 331, § 33.

**4.** L.1976, c. 331, § 42.

The status of Minnesota hospitals under this test has been the subject of two previous decisions. The state relies heavily on *Gillies v. City of Minneapolis,* 66 F.Supp. 467 (D.Minn.1946), which held that the city's operation of Minneapolis General Hospital was a governmental activity.[5] That decision rested on several factors:

(1) A primary function of the hospital was to provide free health care for the city's low-income residents;

(2) The hospital in no sense competed with private hospitals, since no private hospital would be willing to provide services without adequate compensation; and

(3) Although some patients paid for the care they received, revenues collected from patients covered less than 10 percent of the hospital's annual operating costs.

Plaintiffs argue, however, that the case of *Borwege v. City of Owatonna,* 190 Minn. 394, 251 N.W. 915 (1933), should control rather than the *Gillies* decision. In *Borwege,* this court held that the hospital operated by the city of Owatonna was proprietary in nature. The Owatonna hospital, however, was a revenue-producing institution which required no support from the city and provided no health-care services in the interest of the general public welfare. The city hospital was simply a substitute for a private hospital.

In our view, the facts of this case make it more closely analogous to the *Gillies* decision. Minn.St. 253.015 designates several state hospitals whose specific function is to provide care for the mentally ill, and the state hospital at Anoka is among those named in the statute. It could scarcely be argued that these state mental institutions compete with private establishments. And while it is true that some patients or their relatives are required to pay for a portion of their care (see, Minn.St. 246.50 et seq.), the statute is structured in such a way as to ensure that a state hospital could never even approach a profit-making status.

Accordingly, we hold that the operation of the state hospital is a governmental function[6] and that the district court correctly granted summary judgment in favor of the defendant State of Minnesota.

2. In its ruling on the summary judgment motions of the individual defendants, the district court separated these persons into two groups. Each group was granted summary judgment, but on independent legal theories. The first group consisted of the following persons: Kenneth Schoen, Commissioner of Corrections; Orville Pung, Deputy Commissioner of Corrections; William McRae, Superintendent of St. Cloud Reformatory; Charles Gadbois, Associate Superintendent of St. Cloud Reformatory; Vera Likins, Commissioner of Department of Public Welfare; James Hiniker, Deputy Commissioner of Department of Public Welfare; Wesley Restad, Assistant Commissioner of Welfare for Residential Services; John Stocking, Administrator of Anoka State Hospital; and Vincent Graupmann, Assistant Administrator of Anoka State Hospital. All of these defendants are high-level administrators whose individual affidavits establish that none of them had any reason to know of Dion's "medical parole" and subsequent transfer to the state hospital until after the parole decision had been effected. From their affidavits, it appears that none of these defendants was in a position to oversee, participate in, or otherwise alter the decision to send Dion to the state hospital. The district court granted summary judgment in favor of these defendants on the ground that each of them was too far removed from any alleged negligence to be held answerable in damages for it.

---

5. Although we are not bound by the *Gillies* decision, it received our implicit approval in *Miller v. Chou,* Minn., 257 N.W.2d 277, 282 (1977).

6. It could be argued that the critical negligence in this case was that of the prison officials rather than the hospital personnel. Even if this were the case, our conclusion would be the same. The operation of a prison (as distinct from its inmate-operated industries) is so obviously governmental as to require no further discussion.

The district court's action was undoubtedly correct, since none of the information contained in these defendants' affidavits was contradicted by opposing affidavits from plaintiffs. Indeed, it does not appear that plaintiffs offered any affidavits at all in opposition to the defense motions for summary judgment. It is well settled in Minnesota that a nonmoving party may not rely on general statements of fact in his pleadings to oppose a motion for summary judgment. Rather, specific facts must be identified (or their absence justified) which establish the existence of a triable issue of fact. See, e. g., *Moundsview Ind. Sch. Dist. No. 621 v. Buetow & Associates, Inc.,* Minn., 253 N.W.2d 836 (1977); *City of Marshall v. Public Employees Retirement Assn.,* Minn., 246 N.W.2d 572 (1976). In spite of the extended time allowed for discovery in this case, there is nothing in the record which would controvert the statements contained in the defendants' affidavits. In fact, plaintiffs' brief does not specifically challenge the correctness of the district court's ruling as to these defendants. We conclude, therefore, that the district court's grant of summary judgment in favor of these individual defendants was proper.

3. The remaining defendants include the members of the parole board and Dr. Romero. In response to the allegations of personal negligence made against them, these defendants invoke the defense of discretionary immunity. Under this familiar doctrine, state officials are not absolutely immune from suit but ordinarily may be held liable only in the performance of ministerial rather than discretionary duties. As we observed in *Susla v. State,* Minn., 247 N.W.2d 907, 912:

"It is settled law in Minnesota that a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong."[7]

Plaintiffs argue that the remaining defendants do not fall within this statement because their duties do not call for the exercise of judgment or discretion. We recognize that the traditional distinction drawn between "discretionary" and "ministerial" duties has been subject to enigmatic application and occasional breakdown. Nonetheless, we do not find the distinction particularly difficult to make in this case. In *Cook v. Trovatten,* 200 Minn. 221, 224, 274 N.W. 165, 167 (1937), we described ministerial duties as follows:

" * * * A ministerial duty is one in which nothing is left to discretion (*State v. Lindquist,* 171 Minn. 334, 214 N.W. 260 [1927]), a simple, definite duty arising under and because of stated conditions and imposed by law. The idea has been put in this language. 'Official duty is ministerial when it is absolute, certain and imperative, involving merely the execution of a specific duty arising from fixed and designated facts.' *People v. May,* 251 Ill. 54, 57, 95 N.E. 999, Ann.Cas. 1912C, 510."

In *Williamson v. Cain,* 310 Minn. 59, 245 N.W.2d 242 (1976), we held several state employees personally liable for the negligent execution of their ministerial duties. There, the state employees were attempting to demolish an abandoned building and in so doing caused damage to a neighboring structure. On appeal, we stated:

" * * * While the discretionary-ministerial distinction is a nebulous and difficult one because almost any act involves some measure of freedom of choice as well as some measure of perfunctory execution, the acts of the defendants here are clearly ministerial. Their job was simple and definite—to remove a house. While they undoubtedly had to make certain decisions in doing that job, the nature, quality, and complexity of their decision-making process does not entitle them to immunity from suit." 310 Minn. 61, 245 N.W.2d 244.

In this case, the defendant parole board members argue that the nature of their duties epitomizes a discretionary governmental activity. We agree. The perform-

---

7. Plaintiffs do not allege that Dion's transfer to the state hospital was in any way malicious.

ance of their duties requires each member of the board to personally evaluate a body of data and make a discretionary judgment based on that evaluation.[8] Similarly, we find it impossible to term Dr. Romero's position "ministerial" under the foregoing definitions. As the medical chief of the Vail unit at the state hospital, Dr. Romero was charged with the responsibility for evaluating the patients' problems and treatment. The selection and monitoring of treatment programs, based on the personal examination of patients and their files, is in our opinion an indisputably discretionary activity, involving as it does the application of skilled judgment to a wide variety of human conditions. See, *Linder v. Foster,* 209 Minn. 43, 295 N.W. 299 (1940). We are thus unpersuaded by plaintiffs' suggestion that the activities of these defendants were merely ministerial and not protected by the doctrine of discretionary immunity.

■ In an effort to avoid this conclusion, plaintiffs raise two additional points for our consideration. It is first contended that the parole board and Dr. Romero failed to comply with the appropriate statutes when they arranged Dion's temporary transfer to the Vail unit at the state hospital. In so doing, it is argued, they committed a willful wrong which should be deemed to deprive them of discretionary immunity under the rule quoted above from *Susla v. State, supra.* According to plaintiffs, the parole board was powerless to transfer Dion to the state hospital without first having complied with the civil-commitment procedure set forth in Minn.St. 253A.07.

We cannot agree with this proposition. To require full-fledged commitment hearings would seriously hamper the parole board's ability to secure psychological diagnoses and to select proper rehabilitative programs, where possible. The statutory scheme which governs state hospitals and corrections institutions plainly recognizes the need to allow the parole board certain discretion in this regard. Minn.St. 241.07 provides in part:

"The commissioner of corrections may transfer an inmate of the state prison, state reformatory for men, or Minnesota correctional institution for women to a state institution for the mentally ill, mentally retarded or epileptic or to the state sanatorium *for diagnosis, treatment, or care which is not available at the prison or at a reformatory * * *.* No such transfer shall be made by the commissioner of corrections without the approval of the commissioner of public welfare. * * * *" (Italics supplied.)

Minn.St. 246.0251 specifically authorizes the commissioner of public welfare to appoint a medical staff chief at state hospitals who "shall be in charge of all medical care, treatment, rehabilitation and research." In this case, Dr. Romero was the medical chief of the Vail unit at the state hospital and was a proper delegatee of the commissioner's authority to approve the transfer of inmates into the Vail unit under § 241.07. The fact that Dion was granted a "medical parole" does not affect our conclusion. As we observed in *State v. Knox,* Minn., 250 N.W.2d 147, 153 (1976), the term "medical parole" has no technical significance. Thus, we have no difficulty concluding that Dion's "medical parole" was a permissible "transfer" under § 241.07.

Plaintiffs next urge us to follow the lead of the Arizona Supreme Court in *Grimm v. Arizona Bd. of Pardons & Paroles,* 115 Ariz. 260, 564 P.2d 1227 (1977). In that case, a prisoner with a substantial criminal record was paroled and almost immediately thereafter robbed a tavern. In the course of the robbery, he shot three people, killing two of

---

8. Our conclusion finds support in several Federal court opinions. See, e. g., *Thompson v. Burke,* 556 F.2d 231 (3 Cir. 1977); *Pope v. Chew,* 521 F.2d 400 (4 Cir. 1975); *Silver v. Dickson,* 403 F.2d 642 (9 Cir. 1968); *Joyce v. Gilligan,* 383 F.Supp. 1028 (N.D.Ohio, 1974). These cases hold that parole officials, when acting in a discretionary capacity, are immune from suit in civil rights actions under 42 U.S. C.A. § 1983. However, § 1983 immunity is *narrower* than the discretionary immunity which state law recognizes. Thus, if parole officials are immune for § 1983 purposes, they should logically come within the protection of discretionary immunity.

them. A wrongful-death action was filed against the state and the members of the parole board as individuals. The complaint alleged that the parole board had information indicating that the prisoner in question was extremely dangerous and not amenable to rehabilitation. It was argued that granting a parole under such circumstances constituted actionable negligence by the members of the parole board. The trial court and an intermediate appellate court agreed that the board members were immune from suit under the doctrine of discretionary immunity. The Arizona Supreme Court reversed but recognized a qualified immunity:

"* * * The board members should not bear liability for taking the risk allocated to them as a statutory duty. If it reasonably appears that the applicant is a good risk, the board members should not be liable if it turns out that they guessed wrongly.

"We are persuaded that public needs are best served by a qualified rather than absolute immunity for parole board members in relation to their parole decisions." 115 Ariz. 265, 564 P.2d 1232.

Balancing the competing interests, the Arizona court adopted a gross negligence or recklessness standard of care for determining the personal liability of the parole board members. In addition, the court held that such gross negligence or recklessness would not be actionable unless it resulted in the breach of a duty owed to an individual citizen rather than to the public at large.

While it may be that the standard of care enunciated in *Grimm* is not unduly burdensome for public officials, we find it unnecessary to resolve that question in this case. Even if this court were to impose a more stringent standard of care on discretionary officials, the outcome of the present case would be unaffected. There is nothing in the record before us to indicate that these defendants were negligent, let alone reckless. From the uncontroverted affidavits, it appears that Dion was friendly, eager to cooperate, and manifested no signs of dangerous propensities. Accordingly, we decline to judicially expand the tort liability of public servants as did the Arizona court.

The judgment of the district court is affirmed.

Affirmed.