Steven J. CAIRL, et al., Appellants,

v.

STATE of Minnesota, et al.,
Respondents,

Ramsey County Welfare Department, et
al., Respondents,

Mary Ann CONNOLLY, etc., Appellant,

v.

STATE of Minnesota, et al., defendants
and third party plaintiffs,
Respondents,

Bruce Hedge, defendant and third party
plaintiff, Respondent,

RAMSEY COUNTY WELFARE DE-
PARTMENT, defendant and third
party plaintiff, Respondent,

v.

Steven J. CAIRL, et al., third party
defendants, Appellants.

No. 81–437.

Supreme Court of Minnesota.

Aug. 13, 1982.

James Redman, Collins, Buckley, Sauntry & Haugh, St. Paul, for appellants Cairl, et al.

Hvass, Weisman & King and Reed Mac-Kenzie, Minneapolis, for appellants Connolly, etc., et al.

Warren Spannaus, Atty. Gen., William Manning, Sp. Asst. Atty. Gen., St. Paul, for respondent State.

Thomas W. Foley, County Atty., Stephen Befort, Asst. County Atty., St. Paul, for respondent Ramsey County Welfare Dept.

Robert Austin, Minneapolis, for respondent Bruce Hedge.

Minnesota Medical Assoc., Kathleen A. Meyerle, Minn. Psychological Assoc., Donna J. Wolfson, Luther Granquist and Anne Henry, Legal Advocacy for Developmentally Disabled Persons in Minn., Minneapolis, amici curiae.

OTIS, Justice.

This is a negligence action arising out of a fire intentionally set by a boarding student, Tom Connolly, while visiting his family on holiday leave from the Minnesota Learning Center at Brainerd State Hospital. The appellant Cairl sues for damages arising out of the destruction of his apartment building, and Mrs. Connolly seeks damages for the death of her daughter Tina and for severe injuries sustained by her daughter Tamara. Plaintiffs' allege that with a known history of starting fires Connolly's release was negligent, and that the State of Minnesota, the County of Ramsey Welfare Department, and certain state and county employees, breached their duty to warn plaintiffs of Connolly's dangerous propensities. Defendants' motions for summary judgment were granted and we affirm.

The facts are not essentially in dispute. Connolly is borderline mentally retarded with an I.Q. of 57. In September 1976, at age 15, he was adjudicated a delinquent and was placed in a foster home. His mother, a recipient of AFDC, was ill and unable to control him. His problems were thought to be more psychological than delinquent and his supervision was therefore transferred by Ramsey County Juvenile Court from a county corrections officer to county welfare caseworker Douglas Johnson.

His adjustment to the original foster home was unsatisfactory and in February

1977 he was placed in another home. While there he was suspected of starting three fires, one at his mother's home, one in a woods near his foster home, and one in a locker at school. Although he was never adjudicated as having been responsible, there is little doubt but that he was involved.

In May 1977 he ran away and was found in a Roseville apartment at the scene of another fire. Arson charges brought against him were eventually dismissed for lack of evidence. However, by order of the Ramsey County Juvenile Court he was placed in Fairview Hospital's Adolescent Treatment Unit where he stayed for three months prior to his being sent to Minnesota Learning Center. Although his behavior at Fairview Hospital improved, his psychiatrist did note that Connolly's propensity for starting fires resulted from "frustration and aggression and does remain a concern for the next several years."

In September 1977 he was admitted to Minnesota Learning Center which is not a custodial facility designed to segregate dangerous persons, but is an open door facility, operated by the Department of Public Welfare to provide treatment and education to mentally retarded youths with behavioral problems. In order to avoid institutional dependence and to promote speedy re-entry into the community, the Center is committed to treating its students by the least restrictive means and encourages home visits.

Because Connolly had not started any fires at Fairview Hospital his initial program at the Center did not target that problem for treatment. Although in October 1977 he did set a fire in a wastebasket at the Center, the staff apparently did not consider it a serious incident because it was started in an open area and was treated only as an attempt to attract attention. Shortly thereafter he was a suspect in a fire at the Center in November 1977. At that point his behavior became a target for treatment.

A conference attended by his mother, Mary Ann Connolly, and county caseworker, Douglas Johnson, was then held at the Center. His problems were evaluated and a program established to modify his behavior. The subject of a home visit was discussed and a Christmas vacation planned.

On December 21, 1977, Connolly was released for a Christmas home visit by defendant Bruce Hedge, the "community re-entry facilitator" at the Center. While the program to modify his firestarting behavior had not yet been implemented, a review of his file by medical staff at Minnesota Learning Center resulted in a decision to grant him a holiday pass. This decision as part of his overall treatment program, was in accordance with stated policy to provide treatment by the least restrictive alternative, and was based in part upon the fact that Connolly had acquired numerous "token economy" points which are given for good behavior.

Mary Ann Connolly and county caseworker Douglas Johnson were both advised that Connolly was returning home and Douglas Johnson accompanied him there. In the early morning hours of December 23, 1977, Connolly set a fire in the living room couch of his mother's apartment, as a result of which Tina Connolly was killed, Tamara Connolly was severely burned, and the fourplex in which Connolly's mother's apartment was located was destroyed.

The following issues are raised by this appeal:

1. Was the decision to release Tom Connolly for holiday home visit protected by the doctrine of discretionary immunity?

2. Did defendants violate statutes, court order, or regulations in releasing Tom Connolly for holiday home visit?

3. Were defendants under a duty to warn plaintiffs about Tom Conolly's dangerous propensities?

4. Did defendant Bruce Hedge, the community re-entry facilitator at Minnesota Learning Center, waive immunity to the extent of coverage under his private professional liability insurance policy?

■ 1. We first consider whether the decision to release Tom Connolly was protected by the doctrine of discretionary immunity.[1] The State Tort Claims Act and the Municipal Tort Liability Act both provide governmental immunity from tort liability based upon the performance, or nonperformance, of a discretionary act. *See* Minn.Stat. § 3.736, subd. 3(b) (1980) *and* Minn.Stat. § 466.03, subd. 6 (1980). This exemption from tort liability recognizes that the courts, through the vehicle of a negligence action, are not an appropriate forum to review and second-guess the acts of government which involve "the exercise of judgment or discretion." *Susla v. State*, 311 Minn. 166, 175, 247 N.W.2d 907, 912 (1976). As stated in *Weiss v. Fote*, 7 N.Y.2d 579, 167 N.E.2d 63, 200 N.Y.S.2d 409 (1960):

> To accept a jury's verdict as to the reasonableness and safety of a plan of governmental services and prefer it over the judgment of the governmental body which originally considered and passed on the matter would be to obstruct normal governmental operations and to place in inexpert hands what the Legislature has seen fit to entrust to experts.

*Id.* at 585–86, 167 N.E.2d at 66, 200 N.Y. S.2d at 413.

■ The problem, of course, is in determining whether a particular act of government involves the exercise of discretion. As this court recently stated, that determination "has been subject to enigmatic application and occasional breakdown." *Larson v. Independent School District No. 314*, 289 N.W.2d 112, 120 (Minn.1979). The problem is compounded by the fact that almost every act involves some measure of discretion, and yet undoubtedly not every act of government is entitled to discretionary immunity. As we have said, "[d]iscretionary immunity must be narrowly construed in light of the fact that it is an exception to the general rule of [governmental] liability." *Id.* at 121. Accordingly we must examine the nature of the decisionmaking process to determine whether discretionary immunity obtains. *Id.* at 120; *Williamson v. Cain*, 310 Minn. 59, 61, 245 N.W.2d 242, 244 (1976); *Smith v. United States*, 375 F.2d 243, 246 (5th Cir.), *cert. denied*, 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967).[2] The decision to release Tom Connolly, involving as it does the professional evaluation of such factors as the protection of the public, his physical and psychological needs, the relative suitability of the home environment, and the need to reintegrate him into the community, is precisely the type of governmental decision that discretionary immunity was designed to protect from tort litigation by after-the-fact review.[3] It in-

1. We note that plaintiffs' claims for relief focus on the *decision* to release, and not on the negligent implementation of that decision. *See, e.g., Lloyd v. State*, 251 N.W.2d 551, 557 (Iowa 1977).

2. In attempting to limit the doctrine of discretionary immunity our cases have recognized a distinction between discretionary and ministerial acts of government. *See, e.g., Williamson v. Cain*, 310 Minn. 59, 245 N.W.2d 242 (1976). We have also recognized a distinction between governmental decisions made on the executive or planning level of conduct and governmental decisions made on the operational level of conduct. *See, e.g., Hansen v. City of St. Paul*, 298 Minn. 205, 214 N.W.2d 346 (1974). We recently settled on the planning-operational distinction as a guide in determining whether discretionary immunity obtains. *See Larson v. Independent School Dist. No. 314*, 289 N.W.2d 112, 120 (Minn.1980). This distinction alone, however, cannot be dispositive for that would invite a "mere labeling approach" that is often con-

clusory. Note, *The Discretionary Exception and Municipal Tort Liability: A Reappraisal*, 52 Minn.L.Rev. 1047, 1062 (1968). We continue, therefore, to examine the nature of the governmental act complained of in light of the planning-operational distinction.

3. A significant consideration in determining the applicability of discretionary immunity is the extent to which the threat of liability would impair the effective performance of the governmental act complained of. *See* Restatement (Second) of Torts § 895D comment b (1979). If release decisions were exposed to the threat of liability those individuals charged with rendering those decisions would likely become unduly responsive to one consideration—the cost of liability. Moreover, the threat of liability would undermine a statewide policy favoring open door treatment rather than custodial detention of the state's mentally ill. *See* Minn. Stat. § 253A.17, subd. 9 (1980); *see generally*, Note, *Liability of Mental Hospitals for Acts of*

volves the balancing of complex and competing factors comprising "a discretionary choice between alternatives." *Larson v. Independent School District No. 314*, 289 N.W.2d 112, 120 (Minn.1980). Moreover the decision is an important element in planning Tom Connolly's overall treatment program and is thus indicative of "decision-making on the planning level of conduct." *Id.*

This conclusion finds direct support in our decision in *Papenhausen v. Schoen*, 268 N.W.2d 565 (Minn.1978).[4] There, the victim of an aggravated assault and rape committed by a patient of the Anoka State Hospital brought an action against the state and certain state officials alleging negligence in the decision to transfer the patient for a short term medical parole from the high security St. Cloud Reformatory to the minimum security Anoka State Hospital. The patient escaped from the minimum security state hospital and attacked plaintiff. In affirming summary judgment in favor of defendants we stated:

> The selection and monitoring of treatment programs, based on the personal examination of patients and their files, is in our opinion an indisputably discretionary activity, involving as it does the application of skilled judgment to a wide variety of human conditions. We are thus unpersuaded by plaintiffs' suggestion that the activities of these defendants were merely ministerial and not protected by the doctrine of discretionary immunity.

*Their Patients Under the Open Door Policy*, 57 U.Va.L.Rev. 156 (1971).

**4.** We recognize that *Papenhausen* was decided under the law prior to the enactment of the State Torts Claim Act. *Papenhausen* nevertheless remains compelling precedent because the discretionary function exception amounts to a codification of extant common law doctrine. *See, e.g., Coates v. United States*, 181 F.2d 816, 818 (8th Cir. 1950) (discussing "discretionary function" exception in Federal Tort Claims Act, 28 U.S.C. § 2680(a) (1976)); *see generally*, Jayson, *Application of the Discretionary Function Exception*, 24 Fed.B.J. 153 (1964). Moreover, our holding in *Papenhausen* was so strong that it remains controlling.

*Id.* at 572 (citation omitted). *Accord, Johnson v. State of California*, 69 Cal.2d 782, 447 P.2d 352, 73 Cal.Rptr. 240 (1968); *Fuhrmann v. Hattaway*, 109 Mich.App. 429, 311 N.W.2d 379 (1981). In short, regardless of the precise scope of discretionary immunity, defendants in this case did not approach the point at which discretion is exhausted and duty arises.

■ 2. Implicit in our conclusion is a rejection of plaintiffs' alternative argument that defendants acted beyond the scope of their authority in releasing Tom Connolly. In *McCorkell v. City of Northfield*, 266 Minn. 267, 123 N.W.2d 367 (1963), we stated that the violation of an affirmative duty imposed by statute can occasion governmental liability. Here, however, we find no statutory provision imposing an "express obligation" upon defendants. *Id.* at 271, 123 N.W.2d at 370. Moreover, unlike defendants in *Semler v. Psychiatric Institute of Washington, D. C.*, 538 F.2d 121 (4th Cir.), *cert. denied*, 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 90 (1976), defendants in this case were not subject to the mandate of a court order which specifically retained court authority over decisions concerning the placement of the patient.[5] Quite the contrary, the juvenile court approved the placement of Tom Connolly in the open door environment of Minnesota Learning Center where home visits are encouraged as an integral part of a student's overall treatment program.[6] Were plaintiffs challenging a per-

**5.** In *Semler*, a court granted the psychiatric institute custody of a mentally disturbed offender who had been sentenced for abducting a young girl. In its placement order the court imposed the specific condition that the offender "continue to receive treatment at and remain confined in the Psychiatric Institute until released by the Court." 538 F.2d at 124. Later, without court approval, the psychiatric institute placed the offender on outpatient status and while free he abducted and killed plaintiffs' daughter. Plaintiffs recovered $25,000 in damages. *Id.* at 123. *Semler* recognizes that the failure to observe court imposed procedures will not be protected by discretionary immunity.

**6.** The decision to release Tom Connolly for a home visit was in conformity with statutory

manent change of Tom Connolly's status, such as his outright release, the results might be different. *See* 12 MCAR § 2.034 D4 (1978).

3. An equally troublesome issue is whether or not defendants were under a duty to warn plaintiffs of Tom Connolly's dangerous propensities.[7] This is an issue of first impression in this court. We are guided, however, by decisions of the California Supreme Court.

In *Johnson v. State of California*, 69 Cal.2d 782, 447 P.2d 352, 73 Cal.Rptr. 240 (1968), plaintiff brought an action against the state and certain officials for the negligent release of an offender and the failure to warn potential victims. The court concluded that the decision to release was protected by discretionary immunity, but that the subsequent failure to warn amounted to a breach of duty for which liability could be imposed. The existence of a duty to warn in *Johnson* was derived from the fact that a juvenile parolee with "homicidal tendencies, and a background of violence and cruelty" was placed in plaintiff's foster home by a state placement officer. *Id.* at 784, 447 P.2d at 354, 73 Cal.Rptr. at 242. Plaintiff was not aware of, nor did defendant advise her of, the juvenile parolee's potential for violence. She was subsequently attacked and severely injured. The court concluded that there exists "a duty upon those who create a foreseeable peril, not readily discoverable by endangered persons, to warn them of such potential peril." *Id.* at 785, 447 P.2d at 355, 73 Cal.Rptr. at 243 (footnote omitted). The *Johnson* court therefore spoke in terms of a duty to warn of a latent foreseeable threat to specific members of a foster home.

Similarly, in *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976), the court addressed the issue of whether a psychiatric therapist owes a duty to warn a known potential victim of a patient's serious threat of violence. In *Tarasoff*, the therapist's patient made specific threats against a specific individual. The patient later carried out his threats and killed that individual. The court stated:

> [O]nce a therapist does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger. * * * "In sum, the therapist owes a legal duty not only to his patient, but also to his patient's would-be victim * * * ".

*Id.* at 439, 551 P.2d at 345–46, 131 Cal.Rptr. at 25–26 (quoting Fleming and Maximov, *The Patient or His Victim: The Therapist's Dilemma*, 62 Cal.L.Rev. 1025, 1067 (1974)). Thus in *Tarasoff* the court imposed a duty

---

provisions. *See generally* Minnesota Hospitalization and Commitment Act, Minn.Stat. §§ 253A.01—.23 (1980) *and* footnote 4 *supra*. *Cf. Roerig v. Houghton*, 144 Minn. 231, 175 N.W. 542 (1919) (public employee performing statutorily prescribed duties exempt from liability). Moreover, it cannot be overlooked that Tom Connolly was under the control and custody of defendants, in particular the Department of Public Welfare which operates Minnesota Learning Center. The decision to grant Tom Connolly a holiday pass as an integral part of his overall treatment program was undoubtedly incidental to this control and custody.

7. As a general rule at common law a person owed no duty to control the conduct of another. *See* Restatement (Second) of Torts § 315 (1965). In addition, a person owed no duty to warn those endangered by the conduct of another. *Id.* § 314 comment c. The courts, however, have carved out an exception to this rule in cases where defendant stands in some special relationship to either the person whose conduct needs to be controlled or to the foreseeable victim of that conduct. *See Id.* §§ 315–320; *cf. Skillings v. Allen*, 143 Minn. 323, 173 N.W. 663 (1919) (doctor-patient relationship sufficient to support duty of care to patient's family). We think that defendants in this case, in particular those defendants from the Minnesota Learning Center who were charged with the care and treatment of Tom Connolly, did occupy the requisite special relationship with Tom Connolly such that under certain circumstances, discussed *infra*, they would be under a duty to warn third persons of Tom Connolly's dangerous propensities. *See Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976). Accordingly, when we speak of a duty to warn we speak in terms of having first found the requisite special relationship to exist.

to warn a specific potential victim of his patient's specific threats of violence. That is not the issue before us in this case, however, and we intimate no views on how we would rule under those circumstances.

Finally, in *Thompson v. County of Alameda*, 27 Cal.3d 741, 614 P.2d 728, 167 Cal. Rptr. 70 (1980), the California Supreme Court determined the extent of the duty to warn. There, the county released for a home visit a juvenile offender with "latent, extremely dangerous and violent propensities regarding young children." *Id.* at 746, 614 P.2d at 730, 167 Cal.Rptr. at 72. The juvenile offender had indicated that if released he would take the life of a neighborhood child although he did not threaten a specific victim. Within 24 hours of release, the juvenile offender murdered plaintiffs' child. The court distinguished both *Johnson* and *Tarasoff*, wherein the existence of a specific victim gave rise to a duty to warn, by noting that the *Thompson* victim was not "a foreseeable or readily identifiable target of the juvenile offender's threats." *Id.* at 753, 614 P.2d at 734, 167 Cal.Rptr. at 76. The court further stated "that public entities and employees have no affirmative duty to warn of the release of an inmate with a violent history who has made *nonspecific threats of harm directed at nonspecific victims.*" *Id.* at 754, 614 P.2d at 735, 167 Cal.Rptr. at 77. The court limited the duty to warn to circumstances involving a specific threat to a specific individual, in part by reasoning that notifying the public at large of the release of an inmate with general violent tendencies would "produce a cacophony of warnings that by reason of their sheer volume would

add little to the effective protection of the public." *Id.* at 753–54, 614 P.2d at 735, 167 Cal.Rptr. at 77.

■ It is apparent, then, that if a duty to warn exists, it does so only when specific threats are made against specific victims.[8] In this case Tom Connolly did not present a threat to specific victims. In particular, Tom Connolly did not pose a danger to plaintiffs different from the danger he posed to any member of the public with whom he might be in contact when seized with the urge to start a fire.[9] Moreover, as noted in *Johnson*, if a duty to warn exists at all, it is a duty to warn of latent dangers. In this case, Tom Connolly was released to his mother who was well aware of her son's history of starting fires. Accordingly, we hold that under the circumstances of this case, defendants, in particular the staff of Minnesota Learning Center, were under no duty to warn plaintiffs of the potential dangers associated with Connolly's release.

■ 4. Finally we consider whether defendant Bruce Hedge, the community re-entry facilitator at Minnesota Learning Center, waived discretionary immunity to the extent of coverage under his private professional liability policy. Plaintiffs cite Minn.Stat. § 3.736, subd. 8 (1980) and Minn. Stat. § 466.06 (1980) for the proposition that defendant Bruce Hedge did waive immunity when he purchased such insurance. By their very terms, however, these two statutory provisions in the State Tort Claims Act and the Municipal Tort Liability Act apply only to a "state agency" or a "governing body of any municipality." *Id.* Specifically, the purchase of liability insur-

---

**8.** One commentator has suggested that the limitation of the duty to warn to identifiable victims amounts to "a significant departure from the liberal concept of duty developed ... in recent years." Note, *Thompson v. County of Alameda: Tort Plaintiffs' Paradise Lost?* 76 NW.U.L.Rev. 331, 333 (1981). What this commentator fails to acknowledge, however, is that the *Thompson* court limited the identifiable victim requirement to duty to warn cases. The *Thompson* court specifically stated, "[w]ithin this context and for policy reasons the duty to warn depends upon and arises from the existence of a prior threat to a specific identifiable

victim." 27 Cal.3d at 758, 614 P.2d at 738, 167 Cal.Rptr. at 80.

**9.** While plaintiffs might argue that they were exposed to a greater risk because they were more frequently in contact with Tom Connolly than the general public, this is not the type of readily identifiable victim or group of victims to which the court referred in *Thompson*. *See Leedy v. Hartnett*, 510 F.Supp. 1125, 1130 (M.D.Pa.1981). The duty to warn is not owed to statistically probable victims, but rather to specifically targeted victims.

ance only by such entities constitutes a waiver of immunity to the extent of coverage provided. Accordingly, the purchase of professional liability insurance by Bruce Hedge, ostensibly to cover his professional activities outside of Minnesota Learning Center, did not constitute a waiver of immunity.

The judgment of the district court is affirmed.

Affirmed.

YETKA, Justice (dissenting).

I respectfully dissent. I would find that the defendants acted beyond the scope of their authority in releasing Tom Connolly without court approval. Here, the juvenile court specifically ordered treatment in a structured setting and required periodic treatment progress reports to be filed every 90 days. In this case, the report to the court was made only 3 days before Tom was released *and did not contain any mention of the intention to release Tom for a holiday visit.*

The rule, as we established in *McCorkell v. City of Northfield*, 266 Minn. 267, 123 N.W.2d 367 (1963), is that the doctrine of discretionary immunity does not apply where specific standards of conduct as set forth in statutes, regulations, or court orders are violated. *See also Wilson v. City of Eagan*, 297 N.W.2d 146 (Minn.1980). In the instant case, defendants violated the provisions of a court order and regulations of the Department of Welfare. Tom was under the continuing jurisdiction of the Ramsey County Juvenile Court and had been adjudicated a delinquent. In 1977, pursuant to Minn.Stat. § 260.185 (1980), the juvenile court transferred supervision and legal custody of Tom to the Ramsey County Welfare Department. Shortly after, Tom was transferred to the Brainerd State Hospital-Minnesota Learning Center for treatment. During this time, the juvenile court received progress reports about Tom, learned of the fires in which Tom was implicated and issued a series of orders concerning Tom's status and placement. Yet, without first seeking court approval, the Minnesota Learning Center unilaterally released Tom for an unsupervised 2-week home furlough. In releasing Tom in this manner, the Minnesota Learning Center violated the juvenile court order, Minn.Stat. § 260.185 (1980), and the requirements of 12 M.C.A.R. § 2.034 D4 (1978).

In the series of orders dealing with Tom, the juvenile court evinced both an interest in treating Tom and in protecting the public from Tom's pyromania. For this reason, the juvenile court ordered Tom confined at the Minnesota Learning Center and directed that Tom be placed in a structured behavioral program subject to court review. The juvenile court did not make a provision for temporary home visits of any duration; rather, the juvenile court ordered in-patient treatment and specified that it was to be notified of changes in placement or in the case of release. The majority argues that the juvenile court was aware that the Minnesota Learning Center often encouraged home visits as a part of treatment. That may be true, but whether the juvenile court was aware of that policy is irrelevant to this case; in the proper situation, Tom could have been granted temporary leave. The importance of the court order, however, is that these leaves should not have been granted without prior notification to the juvenile court. There is no reason why court approval could not have been obtained in the progress report filed 3 days prior to Tom's release.

Moreover, by not advising the juvenile court of Tom's release, defendants violated 12 M.C.A.R. § 2.034 D4 (1978). Once Tom was admitted to the Minnesota Learning Center, the defendants were obligated to comply with that regulation. The regulation provides that in the case of release:

c. Procedures shall be established so that:

\* \* \* \* \* \*

(2) The court or other appropriate authorities are notified when a resident's release might endanger either the individual or society.

The majority attempts to dismiss this regulation by implying that it applies only to permanent release. Nowhere in the regulations is "release" defined, however. As is amply demonstrated by this case, a temporary unsupervised release of a dangerous patient is as potentially harmful as permanent release; in this case, Tom was suspected of setting at least two fires at the treatment center. Since the clear intent of that regulation is to protect the public, I would interpret release to apply to permanent release, furloughs and temporary home visits.

In addition, I would find that, regardless of the court order and Department of Welfare regulations, defendants are not protected by the doctrine of discretionary immunity. Rather, when an act is performed on the operational as opposed to the planning level of government, discretionary immunity does not apply.[1] *Larson v. Independent School District No. 314*, 289 N.W.2d 112 (Minn.1980).

As we noted in *Larson*, the doctrine of discretionary immunity should be narrowly construed as an exception to the general rule of liability as set forth in Minn.Stat. § 466.03, subd. 6 (1980). *Larson* at 20. Although an argument can be made that the decision to release Tom temporarily was discretionary, any doubts must be resolved in favor of liability. Here, defendants were not choosing the type of treatment Tom was to receive—that had already been determined—but were involved only in the implementation of that treatment. The court had determined that Tom was to be treated in a structured environment. The Minnesota Learning Center where Tom was confined had a policy of encouraging home visits and freedom from *unnecessary* constraints on the patient. The decision to place Tom in this environment was clearly discretionary; the specific decision to grant Tom a home leave was not, but was only a decision at the operational level in furtherance of Tom's more general treatment program.

The case of *White v. United States*, 317 F.2d 13 (4th Cir. 1963) is illustrative of this point. There, the court of appeals found the decision to accord freedom of movement to a patient who later committed suicide not to be discretionary. The court stated:

> While the policy embodied in the Veterans Administration Regulations that patients should be allowed the maximum of freedom warranted by their condition is a discretionary decision, the application of that policy to an individual case is not within the category of policy decisions exempted by the statute. The application of that policy to the individual case is an administrative decision at the operational level which if negligently done will make the Government liable * * *.

*Id.* at 17. Similarly, this case also involved the mere application of a general policy to an individual and therefore was not discretionary.

For the above reasons, I would reverse the summary judgment granted for defendants and, accordingly, I dissent.

---

1. The majority warns that this distinction is not dispositive and that any analysis must involve more than mere labeling. I agree. I disagree, however, with the majority's examination of the nature of the governmental act. Based on an analysis of the nature of the act of releasing Tom, I would conclude that the act occurred on the operational level of activity.