**MIDWAY MANOR CONVALESCENT AND NURSING HOME, INC., Appellant,**

v.

**Dr. Madeline ADCOCK, et al., Ann Newman, et al., Respondents.**

**No. C6–85–2127.**

Court of Appeals of Minnesota.

May 13, 1986.

John M. Broeker, Samuel D. Orbovich, Broeker, Mihalchick & Blumer, Bloomington, for appellant.

Timothy R. Murphy, Geraghty, O'Loughlin & Kenney, P.A., St. Paul, for Dr. Madeline Adcock, et al.

Tom Foley, Ramsey Co. Atty., David M. Fortney, Asst. Co. Atty., St. Paul, for Ann Newman, et al.

Heard, considered and decided by SEDGWICK, P.J., and HUSPENI and NIERENGARTEN, JJ.

## OPINION

SEDGWICK, Judge.

Midway Manor Convalescent Nursing Home appeals from a summary judgment. Midway Manor sued Dr. Margaret Adcock and her employers—Ramsey Clinic Associates, P.A. and Medical Education and Re-

search Foundation, along with Ann Newman and her employers—St. Paul Ramsey Medical Center and St. Paul Ramsey Medical Center Commission, claiming deprivation of its constitutional rights to due process and equal protection and defamation and tortious interference with its business practice. Partial summary judgment on Midway Manor's constitutional claims was denied. The trial court held that Midway Manor had no protectible property interest in receiving patient referrals from defendants and defendants were granted summary judgment on these claims. Defendants Adcock and her employers, Medical Education and Research Foundation and Ramsey Clinic Associates, P.A., were granted summary judgment on all remaining claims. Midway Manor claims it was entitled to summary judgment on its constitutional law claims and that material issues of fact exist on its other claims. We affirm.

### FACTS

In February 1981, Dr. Margaret Adcock, an associate of Ramsey Clinic, P.A. and director of nursing home services for Ramsey Medical Center (Ramsey Hospital), sent a letter to Ann Newman, director of social services at Ramsey Hospital, reporting her observations of "an exorbitant number of skin breakdowns among our patients, as well as other problems," and that "perhaps" there was "some understaffing" at Midway Manor Convalescent Nursing Home (Midway Manor). A copy of the letter was sent to Midway Manor's administrator.

Newman provided copies of this letter to her staff and directed them that it would be wise to check with Dr. Adcock's office before sending patients to Midway Manor. Newman had received reports from patients and their families which substantiated Dr. Adcock's observations and had made similar observations herself. Newman met with the administrator of Midway Manor in late February to discuss these problems. In addition, Dr. Adcock contacted the Health Department.

Respondents Newman, Adcock and the hospital's social worker staff frequently consult with patients and their families about the availability of appropriate nursing home facilities. Newman stated at her deposition that this usually involves providing patients with information. The patients and their families select a home and a social worker prepares the documents transferring them from the hospital to the home.[1] Newman said this process always involved a "great deal of peer consultation." The social workers often rely on feedback from patients, their families, attending physicians and the nurse practitioners who visited the homes in providing patients with information about an appropriate home. The basic policy, according to Newman, is "to find the best home for the patient."

Dr. Adcock monitors about 950 patients residing in over 30 Twin Cities' nursing homes. Dr. Adcock explained:

I feel strongly if I can help people in making decisions about where to place a family member I'm going to do it. I think our elderly should be placed in the best home that's possible for them considering their medical problems, where the family lives, things like that. So I often do speak out on what I think about nursing homes.

Dr. Adcock explained that:

we actually have no control over what home they will go to at all and often don't know what home they will go to until they're actually placed. We try to be available for consultation, but we are not intimately involved or allowed to be involved in the placement of most patients.

When asked what referral policy her clinic used regarding Midway Manor, Dr. Adcock stated that:

information and itemize a patient's belongings when transferring a patient to a nursing home.

---

**1.** The parties have agreed, by virtue of a "Community Wide Transfer Agreement," that a hospital shall send a certain form with standardized

there was not an active effort to send patients to Midway Manor. I don't think at any time we have refused to allow people to choose Midway Manor as their nursing home of choice because we've constantly gotten referrals that have been in St. Paul-Ramsey that have come to Midway Manor.

Newman and her staff did not actively refer patients to Midway Manor from February 1981 to March 1983. During this period, Dr. Adcock sent Newman five letters describing unfavorable conditions she observed at Midway. Newman sent copies of these letters to Midway Manor. Newman stated that observations from Dr. Adcock and nurse practitioners monitoring patients at Midway Manor caused concern in the following areas: poor food (high sodium content, poor taste, insufficient amounts), understaffing, frequent turnover of staff, physical plant deficiencies, skin disorders in the patients, nurses not following doctor's orders on medications, and insufficient bed clothing.

Prior to February 1981 Midway Manor had received bad publicity in the newspapers about its food and poor quality of care. A number of complaints were received by the health department's investigation division from February 1981 through March 1983.

Health department investigations substantiated many complaints. On one visit a health department investigator noted the cook lacked supplies to prepare food in appropriate quantities for the patients' minimum daily requirements. For example, patients received only a few dices of vegetables. The investigator also learned that it was Midway Manor's practice to puree whatever was leftover for patients without teeth rather than planning a menu for them.

Midway Manor was cited on at least one visit for falling below the required nursing level of 2.0 hours/patient/day. Other investigation reports substantiate Dr. Adcock's observations that Midway Manor was staffed very close to the minimum. Allegations such as inadequate bed linens

and inadequate food were also substantiated by health department investigations and citations.

In December 1982 Newman visited Midway Manor to determine whether improvements had been made. Newman determined that the physical plant was improved and that there seemed to be adequate linens available. However, she consulted with Dr. Adcock and learned that she continued to have concerns about the nursing staff. The no referral policy continued until March 1983, when Dr. Adcock's main concerns about Midway Manor had been satisfied. The hospital's social worker staff was accordingly informed that active referrals could again be made.

## ISSUES

Was summary judgment properly granted for respondents on appellant's:

1. constitutional law claims?
2. tort claims?

## ANALYSIS

### I.

Midway Manor argues that the trial court erred in denying summary judgment on its claims that respondents violated its right to procedural and substantive due process and equal protection under the laws.

#### A. *Due process*

A person is entitled to procedural due process whenever a state's action may deprive the party of a protectible property interest. *See Board of Regents v. Roth*, 408 U.S. 564, 576–77, 92 S.Ct. 2701, 2708–2709, 33 L.Ed.2d 548 (1972). A protectible property interest may be derived from state law.

Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits

and that support claims of entitlement to those benefits.

*Id.* at 577, 92 S.Ct. at 2709.

The trial court found that Midway Manor had no protectible property interest in patient referrals from Ramsey Hospital. Midway Manor has not asserted any statutory entitlement to such referrals. Respondents distinguish the Wisconsin case Midway relies on, *Cameo Convalescent Center, Inc. v. Senn,* 738 F.2d 836 (7th Cir.1984), noting that Wisconsin statutes give nursing homes a property interest in referrals from state social service departments and agencies. Minnesota has no such law and does not have a mechanism whereby a nursing home can suddenly be blacklisted by *all* referring state social service agencies for failure to comply with certain standards. *Cf.* Wis.Stat. § 50.-04(4)(d); *see generally Cameo,* 738 F.2d 836 (discusses list and Wisconsin law).

Other cases cited by Midway Manor can also be distinguished because they involve a complete termination of the financial relationship between government and a private party, without warning, recourse or discussion. *See e.g. Orloff v. Cleland,* 708 F.2d 372 (9th Cir.1983) (veterans' hospital suspended a staff physician's privileges even though it had appointed him to an indefinite term).

Here, Midway Manor has not claimed that all state social service agencies have blacklisted it. In fact, Midway Manor continued to receive referrals from Ramsey Hospital. Affidavits of hospital employees indicate that despite a non-active referral position, 16–18 patients were transferred to Midway Manor during the period. In addition, Midway Manor was fully informed of Dr. Adcock's negative observations and Newman's concerns with its facility. Eventually the problems were corrected.

Ramsey Hospital and Midway Manor subscribe to a "Community Wide Transfer Agreement" between hospitals and related health facilities which indicates the forms a hospital should prepare and send with a patient transferring to a nursing home. The stated purpose of the agreement is

to secure for all parties to this agreement the benefits of standardized information and procedures accompanying an individual's transfer between signatory facilities, thus promoting operating efficiency of the individual's transfer.

No language in this agreement can be construed as entitling a home to referrals.

We find no merit to Midway's claim that respondents usurped the state's role of monitoring a home's compliance with statutory standards and regulations. The health care professionals here simply recommended that their patients, who include the elderly and disabled, be placed in nursing homes which were best equipped to meet the patients' health care needs. Their only motive in recommending nursing homes was to provide for the best interests of the patients. Newman and Dr. Adcock both testified that the ultimate decision was made by the patient. Midway Manor's success depends on the vote of the consumer. Its license is not a guarantee of either profit or ensured referrals from county hospitals.

Doctors and hospital social workers should exercise their honest professional judgment and discretion in recommending a suitable nursing home for the elderly or disabled who require such special care.

B. *Equal protection and substantive due process*

The trial court found that all of the nursing homes in the Twin Cities area were subject to the same referral practices as appellants, and that these practices were rationally related to the respondents' legitimate interest in finding suitable nursing home care for patients. It also found that the respondents had no reason to believe that they were violating clearly established law when they carried out their referral practices. Therefore, Midway Manor's equal protection and due process claims are not actionable.

■ The trial court properly determined this issue on the summary judgment motion because whether state action is rationally related to a legitimate government purpose is a legal issue. *See Galvin v. Vermont,* 598 F.Supp. 144, 150 (D.Vt.1984).

■ The trial court applied the proper criteria and its conclusion that a rational relationship existed between respondents' actions and the legitimate goal of patient care is not erroneous. In equal protection analysis, "the pertinent inquiry is whether the classification employed * * * advances legitimate legislative goals in a rational fashion." *Schweiker v. Wilson,* 450 U.S. 221, 234, 101 S.Ct. 1074, 1082, 67 L.Ed.2d 186 (1981). Further,

> If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequity.' *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61 [31 S.Ct. 337, 55 L.Ed. 369].

*Id.* at 235, 101 S.Ct. at 1083 (quoting *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970)).

The finding of a rational relationship between the action and purpose also indirectly satisfies the substantive due process test:

> Due process also requires that legislative enactments not be arbitrary or capricious or, stated another way, that they be a reasonable means to a permissible objective. *Nebbia v. New York,* 291 U.S. 502 [54 S.Ct. 505, 78 L.Ed. 940 (1934) ] * * *.

*Hylen v. Owens,* 251 N.W.2d 858, 861 (Minn.1977) (other citations omitted). The decision to refrain from actively referring patients to Midway Manor was not arbitrary or capricious when it was done, as Dr. Adcock, Newman and the hospital social workers testified, to help patients select the best and most suitable nursing home available for them.

## II.

Midway Manor claims that the trial court erred in granting respondents summary judgment on its tort claims because triable issues were raised.

### A. *Defamation*

The trial court found that:

> Plaintiff's defamation claim is without merit. The record is devoid of any facts tending to prove that the defendants published defamatory statements to patients or the family of patients seeking nursing home care. If such publication did occur, the communications were privileged because of the duties owed by the defendants to the patients, and because of the overriding common interest in finding suitable nursing home care for the patients. There are no facts to indicate that the defendants abused the privilege by acting in bad faith.

Midway Manor failed to present any evidence indicating that the respondents published defamatory statements to patients or their families. Dr. Adcock and Newman each stated that their observations of Midway Manor merely kept them from affirmatively recommending the home to patients seeking counsel about appropriate placement, that their actions were guided by the best interests of the patients, and that no patient was dissuaded from selecting Midway Manor.

■ Midway cannot defeat a summary judgment motion by merely alleging a jury issue:

> [T]he rule in Minnesota is that a party cannot rely upon general statements of fact to oppose a motion for summary judgment. Instead, the nonmoving party must demonstrate at the time the motion is made that specific facts are in existence which create a genuine issue for trial.

*Moundsview Independent School District No. 621 v. Buetow & Associates, Inc.,* 253 N.W.2d 836, 838 (Minn.1977) (citations omitted). In addition,

> A party cannot create a fact issue by claiming that the facts which may be developed on cross-examination at the

time of trial will permit him to reach the trier of facts.

*Borom v. City of St. Paul,* 289 Minn. 371, 374–75, 184 N.W.2d 595, 597 (1971).

The depositions and answers to interrogatories all support the truth of the statements made in Dr. Adcock's letters. No affidavits or other information submitted by Midway Manor contradicted respondents' evidence at the time the summary judgment motion was considered. Although Midway Manor argues the truth or falsity of Dr. Adcock's statements should be submitted to a jury, we agree with the trial court that no jury question was posed.

### B. *Tortious interference with business relations*

The trial court found that respondents did not tortiously interfere with a prospective advantage to Midway Manor from nursing home referrals, and that the challenged referral practices were not wrongful but were justified and protected by the discretionary immunity doctrine.

Tortious interference with a business relationship is:

> based on "the intentional doing of a wrongful act without legal justification or excuse, or otherwise stated *the wilful violation of a known right* \* \* \*, malice in the sense of ill-will or spite not being essential." \* \* \*

*Witte Transportation Co. v. Murphy Motor Freight Lines, Inc.,* 291 Minn. 461, 465–66, 193 N.W.2d 148, 151 (1971) (emphasis supplied) (citations omitted).

Here, as with the defamation claim, Midway Manor cannot defend a summary judgment motion by mere allegations. Midway Manor did not produce any evidence showing that respondents acted with bad motives when respondents adopted their policy of not affirmatively recommending Midway Manor. *See Moundsview,* 253 N.W.2d 836.

The trial court decision is supported on alternate grounds because public employees who perform discretionary acts are immune from tort liability. *See* Minn.Stat. § 466.03, subd. 6 (1984).

This exemption from tort liability recognizes that the courts, through the vehicle of a negligence action, are not an appropriate forum to review and second-guess the acts of government which involve "the exercise of judgment or discretion." *Susla v. State,* 311 Minn. 166, 175, 247 N.W.2d 907, 912 (1976).

*Cairl v. State,* 323 N.W.2d 20, 23 (Minn. 1982).

To determine whether discretionary immunity exists, a court "must examine the nature of the decisionmaking process to determine whether discretionary immunity obtains." *Id.* Here, as in *Cairl,* the selection of an appropriate facility for the patients required the professional evaluation of each patient's particular needs. This type of decision is "precisely the type of governmental decision that discretionary immunity was designed to protect from tort litigation by after-the-fact review." *Id.*

> Further, as the supreme court points out: A significant consideration in determining the applicability of discretionary immunity is the extent to which the threat of liability would impair the effective performance of the governmental act complained of. *See* Restatement (Second) of Torts § 895D comment b (1979).

323 N.W.2d at 23, n. 3. Thus, since failure to grant immunity to the hospital's social workers, who counsel patients about available and appropriate nursing homes, would impair their effective performance, discretionary immunity was appropriately recognized by the trial court.

### DECISION

The trial court properly dismissed appellant's constitutional law claims against respondents as a matter of law. The trial court properly dismissed the tort claims as a matter of law and also because appellant failed to demonstrate the existence of any triable issues.

Affirmed.